Filed 8/11/21  P. v. Morris CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076312 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD272384) |
| ARROW MORRIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Carolyn M. Caietti, Judge.  Affirmed in part; reversed in part; remanded with directions.

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Arrow Morris of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1); premeditated attempted murder (§§ 664, 187, subd. (a); count 2); and three counts of being a felon in possession of a firearm (§ 29800, subd. (a)(1); counts 3-5). The jury also found true that Morris discharged a firearm resulting in death as to count 1 (§ 12022.53, subd. (d)) and, as to count 2, that Morris intentionally discharged a firearm (§ 12022.53, subd. (c)). In a separate proceeding, the trial court found true that Morris suffered a violent felony prior conviction (§ 667, subd. (a)) and a strike prior (§ 667, subd. (b)-(i).)

The court sentenced Morris to prison for 89 years to life plus 37 years and four months.

Morris appeals, contending: (1) the trial court erred by admitting gang evidence against Morris; (2) evidence regarding Morris brandishing guns when angry was improperly admitted at trial; (3) the trial court erred in excluding evidence that Morris's brother was a gang member; (4) there was a prejudicial instructional error regarding felony murder; (5) there was insufficient evidence to support an attempted murder conviction under either the kill zone or direct intent theory; (6) the trial court improperly instructed the jury on an inapplicable kill zone theory; (7) the admission of body camera footage during trial was prejudicial; (8) cumulative errors warrant a new trial; (9) the trial court erred in sentencing Morris to an additional five year term for a violent felony when such an enhancement had not been pled in the charging document; (10) the amount of the minimum fine levied on Morris was improper; and (11) the abstract of judgment should be amended to reflect that the fines and fees should be stayed.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

The People concede that the kill zone instruction was legally erroneous. We cannot conclude that the instructional error was harmless beyond a reasonable doubt on the record before us. As such, we must reverse Morris's conviction for attempted murder. However, we find substantial evidence supported a conviction for attempted murder under a direct intent theory. Therefore, on remand, the prosecution will have the option to retry Morris on that count alone.

In addition, we conclude the court erred in sentencing Morris to two additional five year terms for a violent felony enhancement that was not pled. Also, as the parties agree, the minimum fines levied on Morris were improper and must be corrected along with the abstract of judgment. We therefore vacate Morris's sentence and remand this matter to the superior court to resentence Morris consistent with this opinion, and, if necessary, after a retrial, if the prosecution elects to try the attempted murder charge again. In all other respects, the judgment is affirmed.

## FACTUAL BACKGROUND

On the night of June 10, 2017, James C. and his cousin, Sean R., decided to go to the Madhouse Comedy Club at Horton Plaza. Sean was in town visiting James. During the day, they had gone to a brewery and drunk three mixed drinks before attending the comedy club at about 9:00 p.m. During the comedy show, James went outside. Sean believed James left because he felt ill from drinking. Eventually, Sean went outside the comedy club to find James. The two men ended up walking around Horton Plaza and playing hide and seek. When they were ready to leave, they started walking back toward the comedy club so they could exit the mall.

That same night, Morris, his girlfriend Ashley N., and his brother Alfred M. also decided to go to the Madhouse Comedy Club. On their way to

3

the comedy club, they stopped at a liquor store where they met up with Donnie M. and his friend, Jazmyn A. The two groups followed each other in their respective vehicles and parked in the parking structure at Horton Plaza. Everyone except for Ashley got out of their cars, and the group hung out in the parking structure, drinking alcohol. During this time, Morris asked whether security at the comedy club would "pat" them down before entering. Morris then placed a gun behind the seat in Ashley's car.

Once they arrived at the comedy club, Morris, Ashley, and the rest of their group sat together at a table. They ordered drinks and watched the comedy show. Jazmyn, however, became nervous because she believed Alfred was "mad-dogging" her. She thought Alfred was acting aggressively and was either very intoxicated or mentally ill. Alfred was heckling and making rude comments to some of the comedians. Alfred's actions did not go unnoticed as comedy club security approached the group's table a couple times.

During the show, Ashley and Jazmyn got up to go to the restroom. When Ashley exited the restroom, Morris was waiting for her and appeared angry because he believed Ashley and Jazmyn were having a sexual encounter in the bathroom. Morris slapped Ashley across the face. He then walked outside, and Ashley followed him. Jazmyn returned to the table but could not find Donnie, so she also went outside.

When Jazmyn got outside, she saw Morris and Ashley arguing. Morris was trying to take Ashley's purse, and the two were struggling. Morris pushed Ashley into a wall. After Ashley fell to the ground, Morris grabbed her purse. While Morris was engaged with Ashley, Alfred was leaning against a nearby wall. Morris and Alfred started to leave the area with Ashley's purse.

As Morris and Alfred were leaving, James and Sean were walking toward them while exiting the mall. As the men approached each other, Sean said "hello" prompting Morris to respond, "Don't fucking talk to us." Sean apologized.

Morris then pulled out a gun and fired four or five shots at James and Sean. James was hit in the back of the head, neck, and chest. Sean was grazed by a bullet on his upper left thigh. Sean administered CPR to James, who was laying on the ground bleeding. Emergency personnel arrived at the scene and transported James and Sean to the hospital where James died from his gunshot wounds.

After the shooting, Morris and Alfred ran to the parking garage and sped away in Ashley's car, without paying the required fee for parking in the mall parking enclosure.

When the shooting began, Jazmyn and Ashley ran back into the club. Ashley was crying, and Jazmyn was yelling to "lock the front door," claiming that she almost got shot. The women left the club before the police arrived. Because Morris had taken Ashley's car, the women had to take a rideshare to get home. Ashley was at her house waiting for a locksmith when Morris arrived and returned her keys.

The next morning, Morris sent Ashley a text telling her not to answer her phone if she received any calls from "weird numbers." Ashley called Morris to tell him that detectives had contacted one of her friends. In response, Morris texted her, "Remember your phone is supposed to be lost." Ashley responded, "Tad bit too late."

On the afternoon of June 12, detectives from the San Diego Police Department went to Ashley's house to talk to her about the shooting. Initially, Ashley was hesitant to talk to the detectives and lied about what

happened on the night in question. Ashley later explained at trial that she did not tell the truth because she was afraid of retaliation from Morris. Ashley believed Morris was a member of the O'Farrell Park gang, and the "street code" for gangs was to keep quiet and not talk to law enforcement. Despite her fear, Ashley eventually told the detectives the truth about what happened at the comedy club.

While the detectives were at Ashley's house, Morris sent her a text that he was just relaxing. When Ashley replied to Morris that detectives were at her house, Morris texted, "You already know what to say," and "You wasn't outside when it happened. It's their job to question you since your friend called the police." Morris later sent another text to Ashley imploring her not to give the detectives "any information" and to find out what the detectives know.

Ashley allowed the detectives to search her house. Morris had been staying with Ashley for about a month and kept his belongings in a second bedroom. During the search, the detectives found clothing consistent with what Morris was wearing on the night of the shooting. They also recovered a 5.56 millimeter long-arm rifle along with various ammunition. In a pocket of a jacket hanging in the closet, the detectives found a handgun. Morris's DNA was found on both firearms.

Two days after the shooting, Jazmyn identified Morris as the shooter out of a photographic lineup consisting of six pictures.

At trial, the prosecution called San Diego Police Detective Joseph Brian Castillo as a gang expert. O'Farrell Park Banksters was one of the street gangs Castillo monitored. That gang's primary color was grey, but gang members also would wear red. Castillo explained that there were rules of the

gang relating to talking to police or testifying at a trial.  The most important rule was not to cooperate with any law enforcement.

After being shown pictures of Morris's tattoos, Castillo explained how each tattoo signified Morris's involvement in the O'Farrell Park Banksters.

DISCUSSION

I

THE ADMISSION OF GANG EVIDENCE AGAINST MORRIS

A.  Morris's Contentions

At trial, the prosecution offered the testimony of a gang expert, photographs of Morris's tattoos, and other photographs that allegedly showed Morris was a member of the O'Farrell Park Banksters criminal street gang. Morris argues the trial court committed reversible error by admitting such evidence, which he claims was inadmissible character evidence.  We disagree. On the record before us, we cannot say the trial court abused its discretion in admitting the gang evidence.

B.  Background

The prosecution brought a motion in limine requesting the court allow it to produce evidence at trial of Morris's affiliation with a criminal street gang.  The prosecution argued the evidence was relevant to explain Ashley's hesitancy to testify against Morris as well as provide a reason for Ashley's initial lies to the detectives when asked about the shooting.  Further, the prosecution maintained that the gang evidence also expounded on why Ashley was afraid of Morris.

Morris opposed the prosecution's motion in limine, contending the gang evidence was more prejudicial than probative and violated his federal and state due process rights.

During oral argument on pretrial motions, the trial court indicated its inclination "to allow some limited evidence of the gang issue" because it was probative of the credibility of a key witness. The court also explicitly considered the interplay between the probative nature of the evidence as compared to any prejudice to Morris: "I believe it has probative value, substantial probative value when laid with the prejudice that would exist in having this come before the jury, but I think it needs to be limited." In ruling it would allow limited gang evidence at trial, the court emphasized the purpose of admitting such evidence: "I know there was some—I think it was a baseball cap and the color of clothing, but it's really going towards one of the key witnesses in this case, and that's Ashley, and her credibility, and it's being admitted with that in mind."

During trial, Morris renewed his objection to the gang evidence, including the testimony of the prosecution's gang expert. The court overruled the objections, explaining:

> "I am going to affirm my previous ruling for the reasons I previously mentioned. I went through the test of the probative value, and it is, indeed, relevant to the issues, especially to the credibility of this particular witness. And doing the [Evidence Code section] 352 analysis, while it does—is prejudicial, when balanced with probative value, the probative value substantially outweighs the prejudicial effect of allowing it in."

## C. Analysis

When a gang enhancement is not alleged, "evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) " '[A]dmission of evidence of a . . . defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal

8

disposition and is therefore guilty of the offense charged.' " (*People v. Brown* (2003) 31 Cal.4th 518, 547 (*Brown*), quoting *People v. Williams* (1997) 16 Cal.4th 153, 193.)

Yet, there is no absolute ban to the admission of gang evidence at trial when there is no gang allegation alleged. Instead, gang evidence, having any tendency in reason to prove or disprove the truthfulness of a witness's testimony, may be considered by a jury. (See Evid. Code, § 780; *People v. Harris* (1985) 175 Cal.App.3d 944, 957 (*Harris*).) Moreover, evidence weighing on a witness's credibility includes evidence that the witness is afraid to testify or is fearful of retaliation. (See *People v. Sapp* (2003) 31 Cal.4th 240, 301; *People v. Gutierrez* (1994) 23 Cal.App.4th 1576, 1587-1588 (*Gutierrez*).) "It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible. [Citation.]" (*Gutierrez*, at p. 1588; see *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368 (*Olguin*) [evidence that the witness was threatened by a reference to a gang was admissible because it went to the witness's state of mind].)

However, even if gang evidence is relevant, it may be excluded under Evidence Code section 352. Under that statute, courts should exclude evidence where "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Here, the challenged gang evidence was admitted over relevancy and Evidence Code section 352 objections. We review a trial court's decision to admit such evidence for an abuse of discretion. (*Brown*, *supra*, 31 Cal.4th at

9

p. 547; *Olguin, supra,* 31 Cal.App.4th at p. 1369.) "The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. [Citation.]" (*People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) "It is appellant's burden on appeal to establish an abuse of discretion and prejudice." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 225.)

In the instant matter, Ashley was a key witness who identified Morris as the shooter. However, her testimony was less than clear and her credibility was challenged by the defense. For example, Ashley did not report the shooting to the police officers who went to her house to do a welfare check the morning after the shooting. She testified that she was "scared to say anything about it." At that point, Morris was at her house and Ashley expressed concern that if she "said something" to the police "and they came in the house" with Morris there, "it wouldn't have ended well."

On the Monday following the shooting, when the detectives interviewed Ashley about the shooting, she initially said she did not know the identity of the shooter. During her direct testimony at trial, Ashley explained that she was afraid to identify Morris as the shooter because she was "by [her]self" and "when things happen you just keep your mouth shut." In other words, Ashley admitted she was afraid of "retaliation." After being questioned by the prosecutor about why she was fearful of retaliation, Ashley eventually explained: "The street code, period, as far as gangs, like things happen and you don't say anything." Nevertheless, at trial, Ashley testified that she saw Morris pull out a gun after he took her purse.

During cross-examination at trial, Ashley testified that she only told the detectives that Morris was the shooter after the detectives informed her

10

there was a video of the shooting. Further, Ashley admitted that when asked by the detectives who was the shooter on the night in question, she responded: " 'I feel it, I can't sit here and say I saw it and lie to your face and say I saw it because I can't. That's my suspicion and what I feel in my heart.' " Morris's trial counsel also elicited evidence that Ashley told the defense investigator that she was unsure if Morris shot the gun, that when she spoke with the police she felt like she saw Morris shoot the gun, but when she spoke with the defense investigator in January 2019, she did not know who shot the gun.

On redirect, Ashley testified that she decided to recant to the defense investigator about the events on the night of the shooting because she "felt there were things that [she] didn't know as far as the case on both sides." She also admitted that, at the time of the trial, she still had feelings for Morris and was trying to protect him while testifying. In addition, Ashley expressed that she remained afraid of Morris. She then testified that Morris fired the gun on June 10th at Horton Plaza.

However, on recross-examination, Ashley testified that she told the defense investigator that she did not see Morris shoot the gun. Yet, she explained that she was not telling the truth to the defense investigator at that time and was trying to help Morris. Also, Ashley testified that she felt pressured by the defense investigator as well as the detectives.

Here, it is clear the prosecution relied on Ashley's testimony to identify Morris as the shooter. She was a key witness because she was with Morris at the scene of the crime on the night in question. They were involved in a romantic relationship at the time and communicated about the shooting. Nonetheless, Ashley provided inconsistent statements to the police and the defense investigator. She admitted as much on the witness stand. She told

11

detectives she was afraid of Morris and reiterated that she remained afraid of him at the time of trial. The defense attacked Ashley's credibility during cross-examination. Against this backdrop, the limited evidence of Morris's gang involvement was probative of Ashley's credibility, specifically to better explain why she was hesitant to tell the truth and/or testify. (See *Harris*, *supra*, 175 Cal.App.3d at p. 957 ["[u]nder the facts of this case, evidence of gang membership was relevant on possible threats to prosecution witnesses, resulting in obvious bias during testimony"].) The jurors were entitled to hear evidence that would allow them to evaluate the reasonableness of Ashley's fear of Morris. (See *ibid*.)

Moreover, because the concept of retaliation in gang culture is not common knowledge to most jurors, we are not troubled that the trial court allowed the prosecution to offer limited testimony from its gang expert. At trial, the prosecutor asked Castillo four questions about O'Farrell Park Banksters gang in general and three questions about snitching and retaliation in the gang culture. The prosecutor also showed Castillo one photograph in which he identified Morris and four photographs of Morris's gang tattoos. The prosecutor did not ask Castillo about any significant history of the gang, the gang's primary activities, or Morris's status as a member of the O'Farrell Park Banksters. Indeed, Castillo's direct testimony was fairly succinct, consisting of only six pages in the reporter's transcript.

Nevertheless, Morris asserts the gang evidence was cumulative of other evidence showing Ashley was afraid of him. To this end, Morris points out there was evidence that: on the night of the shooting, he hit Ashley in the face, pushed her to the ground, and took her purse; he previously threatened Ashley by telling her the only way she would be able to leave him was "in a body bag"; he was controlling of Ashley to the point she had no other friends;

12

Ashley was so afraid of Morris that she hid in the closet when she called her friend; and Ashley relocated after talking to the detectives. However, none of this evidence provides context for Ashley's trial testimony where she discussed being afraid of Morris retaliating against her because she did not adhere to the "street code" of not talking to the police. Instead, it was the limited gang evidence that best explained Ashley's fear of retaliation. (Cf. *People v. Sapp, supra*, 31 Cal.4th at p. 301; *Gutierrez, supra*, 23 Cal.App.4th at pp. 1587-1588; *Olguin, supra*, 31 Cal.App.4th at p. 1368; *Harris, supra*, 175 Cal.App.3d at p. 957.)

Moreover, Morris's reliance on the other evidence he claims established Ashley's fear of him is somewhat overstated. For example, Ashley testified that before the night of the shooting, Morris had never been physically violent with her. Ashley also testified that she had never tried to leave Morris or break up with him. On this record, we cannot say that the limited gang evidence admitted at trial was cumulative of other evidence that Ashley was afraid of Morris.

Additionally, we are not persuaded by Morris's claim that the limited gang evidence was unduly prejudicial. As we discuss *ante*, under Evidence Code section 352, the trial court has discretion to exclude evidence, among other reasons, "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." (Evid. Code, § 352; see *People v. Williams, supra*,16 Cal.4th at p. 193.) " 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]"

13

(*People v. Zapien* (1993) 4 Cal.4th 929, 958.) "In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008-1009.)" (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

Here, the trial court carefully balanced the probative value of the gang evidence with its prejudicial impact, specifically finding "the probative value substantially outweighs the prejudicial effect of allowing it in." And although the expert witness occasionally and briefly touched upon inflammatory subjects, any prejudice resulting from this testimony was far outweighed by its probative value going to Ashley's credibility.[2] Moreover, the court limited the type of gang evidence admitted. The trial court did not abuse its discretion in admitting this evidence.

Further, our analysis does not change when we consider *People v. Cardenas* (1982) 31 Cal.3d 897 (*Cardenas*) as Morris urges us to do. In that case, the issue was whether the appellant committed the crime, and the testimony was "sharply conflicting." (*Id.* at p. 901.) The identification testimony contained many discrepancies, and the appellant had an alibi. (*Id.* at pp. 902-903.) The prosecutor attacked the credibility of defense witnesses by eliciting testimony that the appellant and the witnesses were all members of the El Monte Flores gang. (*Id.* at p. 903.) The appellate court concluded

---

[2] For example, Castillo testified that he had seen gang members retaliate against individuals who cooperated with law enforcement or testified in court by verbally reprimanding, physically beating up, or even killing such individuals.

14

that the trial court abused its discretion by allowing the introduction of the appellant's gang affiliation. (*Id*. at p. 904.) The court determined that the evidence was cumulative and of minimal probative value in that it was offered only to establish the witnesses' bias, when other evidence already showed the witnesses were the appellant's friends and fellow boys club members. (*Ibid*.) On the other hand, there was a substantial danger of undue prejudice in the form of the jury inferring the appellant had a criminal disposition because the gang committed crimes and he was a member. (*Id*. at p. 905.)

Unlike in *Cardenas*, here, the evidence was limited and highly relevant for a specific purpose—to explain Ashley's inconsistent statements and hesitancy to testify against Morris. It was not cumulative of other evidence, and it was very limited in scope. It was brief and connected solely to Ashley's fear in identifying Morris as the shooter. Moreover, the trial court instructed the jury that certain evidence was admitted for a limited purpose, and to only consider that evidence for that purpose and no other. Specifically, the trial court said that gang evidence, consisting of testimony from a detective and others, was admitted for the limited purpose of assessing the credibility of Ashley and to consider this evidence for that purpose and for no other. The jury was also instructed on how to evaluate expert testimony and to disregard any part of an opinion found to be unsupported by the evidence. We assume the jury followed these instructions. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1234.)

In short, a court's ruling under Evidence Code section 352 " ' "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" ' " (*People v. Williams*

15

(2008) 43 Cal.4th 584, 634-635.) In the instant matter, the court engaged in a careful, detailed analysis of the proffered evidence and admitted only the evidence that avoided undue consumption of time and was unduly prejudicial. The court did not abuse its discretion.

## II

## EVIDENCE THAT MORRIS WOULD BRANDISH GUNS

### A. Morris's Contentions

Morris contends the trial court abused its discretion in admitting evidence that he brandished guns when he was angry. Specifically, he asserts such evidence was inadmissible and should have been excluded under Evidence Code sections 352 and 1101, subdivision (a).

### B. Background

As part of the prosecution's motion in limine to admit limited gang evidence at trial, the prosecution also argued that the court should admit evidence of Morris's prior incidents of gun use. To this end, within its motion, the prosecution set forth four instances in which Morris either pulled out his gun or shot at cars. Morris opposed the motion in limine, arguing that evidence of his prior gun use was unduly prejudicial and cumulative of other evidence to the extent the prosecution was offering the evidence to explain why Ashley was afraid of Morris.

During oral argument on the prosecution's motion to admit the prior incidences of gun use, the trial court indicated that it believed such evidence was inadmissible character evidence under Evidence Code section 1101, subdivision (a). However, the court then discussed the possibility of admitting a "sanitized . . . version" of the gun evidence because it was probative of Ashley's fear of Morris. The court explained:

> "So would have an individual who is expected to testify, that's Ashley, who it's my understanding said she—well,

16

it's already been brought up that she did not—she's been inconsistent with what she said occurred, and initially not even [ac]knowledging that it occurred. The offer by the People is that she is fearful. I do believe that a more sanitized, if you will, version of some of this should be brought up to explain her fearfulness as the testimony plays out as the People suspect it will. I also want to make sure it doesn't infringe on [Evidence Code section] 1101(a).

"My thought was if it is true that she is fearful of honestly making a statement about who, in her mind, was the shooter because she's afraid, and why she was afraid is because the defendant is known to carry a gun and has pulled the gun out in the past, I believe that would be appropriate. The next step where he's been known to shoot people when he's upset goes beyond what I believe would be appropriate unless the door is open. I don't know if anyone wants to argue that one."

In response, the prosecutor suggested it was premature to argue the issue further before seeing how Ashley would testify at trial. Morris's trial counsel commented that, in considering the way in which the court had sanitized the evidence, he did not believe an Evidence Code section 402 hearing was necessary. Nevertheless, he stated he still objected to the evidence.

At trial, the gun evidence was part of the following testimony from Ashley:

"Q  Now, you knew the defendant had guns; is that correct?

"A  Yes.

"Q  He had a rifle; is that correct?

"A  Yes.

"Q  And he had a handgun; is that correct?

"A  Yes.

17

"Q  Did you see him take out guns when he got angry?

"A  Yes.

"Q  At times did you believe the defendant was controlling of you?

"[Morris's trial counsel]:    Objection.  Relevance 352.

"THE COURT:        Overruled.

"THE WITNESS:    Yes."

## C.  Analysis

Evidence Code section 1101, subdivision (a) " 'expressly prohibits the use of an uncharged offense if the *only* theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 406.)  Although evidence of the defendant's commission of other crimes, civil wrongs or bad acts is inadmissible to prove the defendant's conduct on a specified occasion, such evidence can be used to support or attack a witness's credibility.  (Evid. Code, § 1101, subd. (c); *People v. Kennedy* (2005) 36 Cal.4th 595, 620 [limitations on the admissibility of evidence of specific instances of misconduct "do not apply to evidence offered to support or attack the credibility of a witness"]; *People v. Hawthorne* (2009) 46 Cal.4th 67, 99 ["Unless precluded by statute, any evidence is admissible to attack the credibility of a witness if it has a tendency in reason to disprove the truthfulness of the witness's testimony"].)  Such evidence may also be admitted to prove a material fact in dispute such as motive, intent, preparation, plan, knowledge, or the absence of mistake or accident.  (Evid. Code, § 1101, subd. (b); *People v. Cage* (2015) 62 Cal.4th 256, 273; *People v. Jones* (2013) 57 Cal.4th 899, 930.)

18

In the instant action, much like in considering the limited gang evidence, the trial court engaged in careful evaluation of the admissibility of prior instances of Morris's use of guns. As such, the court ruled that evidence of Morris's prior use of guns was not admissible under Evidence Code section 1101, subdivision (a). This evidence included Morris threatening others with guns and shooting at cars. However, the court determined that evidence that Ashley was aware that Morris carried a gun and had pulled a gun out in the past was relevant as to Ashley's credibility. Alternatively stated, such evidence was probative of Ashley's fear of Morris and would help explain why she provided inconsistent statements to the detectives and the defense investigator.

Although the connection between Ashley's testimony about her knowledge of Morris's use of guns and her fear of Morris could have been better developed at trial, we conclude the trial court did not abuse its discretion in admitting the limited gun evidence. After admitting that she knew Morris had guns and he would pull them out when he was angry, Ashley testified that she was afraid of Morris and was worried about Morris getting upset with her. For example, Ashley testified about her fear of Morris becoming angry with her if she called her friend:

> "Q: What were you afraid of?
>
> "A: I was afraid of something happening to me. He'd [Morris] gotten angry before, you know, so —
>
> "Q: Okay. So you were afraid of him?
>
> "A: Yes.
>
> "Q: You didn't want him to get angry?
>
> [objection overruled]

19

"A: I didn't want him to get upset with me."

Moreover, even if we assume the trial court abused its discretion by admitting the gun evidence, we would find such error harmless. It is well-settled that the standard for admitting improper character evidence is to be decided under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Malone* (1988) 47 Cal.3d 1, 22 [error in admitting improper character evidence tested by *Watson* harmless error standard]; *People v. Mullens* (2004) 119 Cal.App.4th 648, 658-659 [error in admission or exclusion of evidence following exercise of discretion under Evid. Code, § 352 in considering whether to admit propensity evidence under Evid. Code, § 1108 reviewed under *Watson* harmless error test].) Under this familiar standard, we ask whether it is reasonably likely the jury would have returned a more favorable verdict had the trial court excluded the evidence. (*Watson*, at p. 836.)

The evidence against Morris was strong. Morris was seen fighting with Ashley by the restroom in the comedy club and then outside where he proceeded to push her down and steal her purse. Eyewitness identification of the clothing worn by the shooter matched that worn by Morris. Specifically, all of the witnesses stated that the shooter was wearing a red shirt and a red baseball cap. Two employees of the comedy club said that the shooter was the same person who was arguing with and pushed down Ashley. Sean identified Morris as the shooter at trial, stating he was haunted by his face every day. Ashley's identification of Morris as the shooter was corroborated by her cousin, who testified that the day after the shooting, Ashley told her that Morris had shot someone.

After the shooting, Morris and his brother fled from the mall, exiting the parking structure without paying. Morris tried to dissuade Ashley from

20

telling the detectives anything about the shooting. In addition, Morris changed his appearance from the date of the shooting to the date of trial. All these actions showed his consciousness of guilt. (See *People v. Pitts* (1990) 223 Cal.App.3d 606, 877 ["Flight is relevant because it may demonstrate consciousness of guilt"]; *People v. Randle* (1992) 8 Cal.App.4th 1023, 1036 [evidence of change of appearance can be relevant to show a defendant's consciousness of guilt]; CALCRIM No. 371.)

In addition, with respect to the limited evidence of Morris displaying a gun when angry, any error was not prejudicial because the jury already heard Morris owned several guns and he asked whether security at the comedy club patted down the customers for weapons. Also, the question about whether Ashley had seen Morris pull out a gun when angry was a single question in Ashley's lengthy testimony. In light of the strong evidence against Morris, we cannot say this one question constituted reversible, prejudicial error.

## III

## THE EXCLUSION OF EVIDENCE THAT ALFRED WAS A GANG MEMBER

At trial, Morris's primary defense theory was that his brother Alfred was the shooter. During the cross-examination of the prosecution's gang expert, Morris's trial counsel asked Castillo if Alfred was a gang member. The prosecutor objected, and the parties discussed the issue with the trial court at a sidebar. The prosecutor argued that whether Alfred was a gang member was irrelevant and beyond the scope of her direct examination of Castillo. Defense counsel countered that the gang evidence was relevant to show that Ashley was afraid of Alfred and thus would not testify that he was the shooter. The prosecutor then pointed out that there was no evidence that Ashley was scared of Alfred. The court agreed and concluded it would not

21

allow this line of questioning to proceed. It observed that defense counsel's questioning of Castillo was beyond the scope of his direct testimony, and the court did not "recall Ashley talking about fear or concerns about Alfred."

Here, Morris argues the court abused its discretion in prohibiting evidence at trial that Alfred was a gang member. To this end, he emphasizes that Ashley testified that she feared retaliation based on the "street code" that a person does not talk to the police or testify in court regarding what he or she saw. Morris insists that Ashley's apprehension of retaliation would extend to Alfred because he also was a gang member. Morris's argument overlooks the difference between Ashley's testimony about him compared to her testimony about Alfred.

Ashley told alternative versions of what she observed on the night of the shooting. After initially denying that she saw Morris shoot the victim, she told the detectives that Morris was the shooter. However, she later told the defense investigator that she did not see Morris shoot the gun outside the comedy club. Ashley also testified that she was afraid of Morris and was concerned what could happened to her if she testified against Morris. The court therefore allowed the prosecution to present evidence that Morris was a gang member to better explain why Ashley was afraid of him.

Morris essentially asserts that because such evidence was admitted as to him, it should have been admitted as to Alfred. In other words, the evidence was relevant to show that Ashley was afraid of Alfred and explain why she did not say Alfred was the shooter. We disagree.

Ashley testified at trial that she was not sure if Alfred was a gang member. She also testified that she did not believe that she told detectives that Alfred was in a gang. Further, Ashley did not testify that she was afraid of Alfred. Nor did she change her testimony about Alfred's involvement in

22

the shooting. Additionally, this was not a gang case. There were no gang allegations. And the prosecution did not ask Castillo about Alfred or his involvement in any gang. In short, we agree with the trial court that evidence that Alfred was a gang member was beyond the scope of the prosecution's direct examination of Castillo and had no relevancy as to Ashley's credibility. The court did not abuse its discretion in excluding the testimony.[3]

IV

JURY INSTRUCTIONS

A. Morris's Contentions

Morris contends the trial court prejudicially erred when it declined to provide the jury with an instruction on the "logical nexus element" of felony murder. We disagree.

B. Background

During the discussion of jury instructions, defense counsel asked the trial court to include a bracketed portion of CALCRIM No. 540A [Felony Murder: First Degree—Defendant Allegedly Committed Fatal Act], which clarified the logical nexus between the felony and the homicidal act. The bracketed portion read: "There must be a logical connection between the cause of death and the [felony]. The connection between the cause of death and the [felony] must involve more than just their occurrence at the same time and place." The prosecutor maintained that the bracketed portion did

---

[3] The People argue the trial court was well within its discretion to exclude evidence that Alfred was a gang member under Evidence Code section 352. Although we do not disagree that a court would correctly exercise its discretion to exclude this gang evidence under Evidence Code section 352, there is no indication that the court engaged in any analysis or balancing under that section when it sustained the prosecution's objection. As such, we eschew any discussion of Evidence Code section 352 on this issue.

23

not apply because Morris's crimes were a continuous act. The trial court then observed that the cases that discuss the need for an instruction on a logical nexus involve multiple perpetrators and the instruction applies to the nonshooter or nonkiller. The court added that because Morris was the only alleged perpetrator, the theory of felony murder was sufficiently covered by CALCRIM No. 540A.

Defense counsel responded that the bracketed portion should be given because the jury could determine that although Morris had committed a robbery and not yet reached a place of safety, he committed the shooting because he had lost his temper and not to effectuate his escape. The trial court responded that it did not plan to give the bracketed portion, but if Morris's counsel could find case law that discussed it in the context similar to the instant action, i.e. a single perpetrator, the court would reconsider its ruling. There is no indication in the record that defense counsel provided the requested authority.

The trial court subsequently instructed the jurors on felony murder under CALCRIM No. 540A as follows:

> "The defendant is charged in Count 1 with murder, under a theory of felony murder.
>
> "To prove that the defendant is guilty of first degree murder under this theory, the People must prove that:
>
> "1. The defendant committed a Robbery;
>
> "2. The defendant intended to commit Robbery;
>
> AND
>
> "3. While committing Robbery the defendant caused the death of another person.
>
> "A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

24

"To decide whether the defendant committed Robbery, please refer to the separate instructions that I have given you on that crime. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder.

"The crime of Robbery continues until a defendant has reached a place of temporary safety.

"It is not required that the person die immediately, as long as the act causing death occurred while the defendant was committing the felony.

"It is not required that the person killed be the intended victim of the felony."

## C. Analysis

Under the felony-murder rule, a killing "committed in the perpetration of, or attempt to perpetrate," a robbery is first degree murder. (§ 189.) The statutory phrase that the killing be "committed in the perpetration of" the felony does not require "a strict causal or temporal relationship between the felony and the murder . . .; what is required is proof beyond a reasonable doubt that the felony and murder were part of one continuous transaction." (*People v. Young* (2005) 34 Cal.4th 1149, 1175; see *People v. Chavez* (1951) 37 Cal.2d 656, 669 ["The law of this state has never required proof of a strict causal relationship between the felony and the homicide."].) Moreover, the felony-murder rule holds the defendant strictly responsible for a killing committed during certain enumerated felonies, regardless of whether the killing was intentional, negligent, or accidental. (*People v. Washington* (1965) 62 Cal.2d 777, 781.) The defendant need only have the specific intent to commit the underlying felony. (*People v. Cavitt* (2004) 33 Cal.4th 187, 197 (*Cavitt*).) Thus, "first degree felony murder encompasses a far wider range of individual culpability than deliberate and premeditated murder. It includes

25

not only the latter, but also a variety of unintended homicides . . .; it embraces both calculated conduct and acts committed in panic or rage, or under the dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable." (*People v. Dillon* (1983) 34 Cal.3d 441, 477.)

In accordance with these principles, the court instructed the jury on the required elements of first degree felony murder (CALCRIM No. 540A). However, Morris argues this instruction was insufficient and the court should have instructed the jury on the requirement of a logical nexus between the felony and the act causing death. The People counter that the logical nexus requirement only applies to felony-murder cases when a coparticipant in the felony, not the defendant, has allegedly committed the fatal act. (*People v. Huynh* (2012) 212 Cal.App.4th 285, 310.) On the record before us, we need not resolve this dispute because, even if we assume the trial court erred in failing to instruct the jury regarding the logical nexus requirement, we would determine such an error was not prejudicial.

State law error in connection with a jury instruction is subject to the harmless error test set forth in *Watson*, *supra*, 46 Cal.2d 818. (See *People v. Breverman* (1998) 19 Cal.4th 142, 174-176.) In *Watson*, the court explained that reversal is required "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probably that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.)

The felony-murder rule does not require "a killing to advance or facilitate the felony, so long as some logical nexus existed between the two." (*Cavitt*, *supra*, 33 Cal.4th at p. 198.) In the instant action, the evidence overwhelmingly establishes a logical nexus between the robbery and the

killing of James. Indeed, James was shot during the commission of the robbery. As the jury was instructed, a robbery is a continuing offense that is not complete until the perpetrator reaches a place of temporary safety. (*People v. Harris* (1994) 9 Cal.4th 407, 421.) Here, Morris was near the place in which he took Ashley's purse after pushing her to the ground. He was in the process of leaving that area when he encountered the two victims and shot them. There is no indication in the record that Morris had reached a place of temporary safety, and he does not argue that he did so here. Under these facts, we conclude there was not a reasonable probability that a result more favorable to Morris would have been reached had the jury been instructed on the concept of logical nexus.

V

ATTEMPTED MURDER

A. Morris's Contentions

Morris also challenges his conviction for attempted murder. He argues substantial evidence does not support his conviction, a jury instruction on the "kill zone" was not warranted by the evidence proffered at trial, and the "kill zone" jury instruction that was provided to the jury was legally erroneous. We address the jury instruction issues first.

B. Kill Zone Jury Instruction

The trial court instructed the jury as follows as part of its instruction on the crime of attempted murder:

> "A person may intend to kill a specific victim or victims
> and, at the same time, intend to kill everyone in a
> particular zone of harm or, quote, 'kill zone,' closed quotes.
> In order to convict the defendant of the attempted murder
> of Sean . . . , the People must prove that the defendant not
> only intended to kill James . . . , but also either intended to
> kill Sean . . . or intended to kill everyone within the kill
> zone.

27

"If you have a reasonable doubt whether the defendant intended to kill Sean . . . or intended to kill James . . . by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Sean . . . . If you find the defendant guilty of attempted murder, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully and with deliberation and premeditation."

Morris contends it was error for the trial court to give this instruction because the evidence was insufficient to support application of the kill zone theory of attempted murder. The People argue that Morris waived any challenge to this instruction by failing to object at trial. Although Morris did not object, we consider the issue on the merits because the alleged instructional error on intent affects Morris's substantial rights. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1294, fn. 28.)

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.]" (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).) Because direct evidence of intent to kill is rare, that intent must ordinarily be inferred from the actions and statements of the defendant and the circumstances surrounding the crime. (*Ibid.*) In *People v. Bland* (2002) 28 Cal.4th 313, the California Supreme Court endorsed the concept of a concurrent intent to kill as a permissible theory for establishing the specific intent required for attempted murder. (*Canizales*, at p. 602.) The court in *Bland* applied what is commonly referred to as the "kill zone" theory of attempted murder. Under that theory, the prosecution can attempt to show either that the defendant's intent to kill one or more alleged victims arose independently of his actions toward any other victim, or that the intent to kill an untargeted victim rose concurrently with the intent to kill a primary target. (*Canizales*, at p. 603.)

28

In *Canizales*, *supra*, 7 Cal.5th 591, our high court concluded that the kill zone theory may be applied only when the following two-part test is satisfied: "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Id*. at p. 607.)

The court in *Canizales* determined there was insufficient evidence in that case that the defendants intended to create a zone of fatal harm, and it was error to instruct the jury on the kill zone theory. (*Canizales*, *supra*, 7 Cal.5th at pp. 611-612.) The evidence presented at trial in *Canizales* showed that the shooter fired five bullets from a nine-millimeter handgun at a distance of either 100 or 160 feet away. The attack occurred at a block party on a wide city street, not in an alleyway, cul-de-sac, or some other area or structure from which victims would have limited means of escape. Neither the primary target nor the other alleged victim was struck by any bullet. (*Id*. at p. 611.)

The instant action is factually distinguishable from *Canizales*. Here, the evidence in this case showed that Morris fired four or five shots into a targeted area. The victims were walking side-by-side and their freedom of movement was constrained because they were in a partially closed corridor on an upper floor at the mall. Simply put, the victims did not have a

29

meaningful escape route. They were all but trapped at the mercy of Morris. In fact, when Morris began shooting, the victims were both about 10 feet away from Morris. Sean testified that he could feel "air" as Morris was shooting, and he felt a few shots go toward his chest and then was hit by a bullet in his leg. James, the alleged primary target who was next to Sean, was shot three times. Thus, both victims were struck with a bullet.

Although we determine the instant matter is distinguishable from *Canizales* and possesses certain characteristics we would expect to see in a kill zone case (see, e.g., *People v. Winfield* (2021) 59 Cal.App.5th 496, 517-519 (*Winfield*)), we note what is lacking in the record is any reason for identifying James as the primary victim. The kill zone theory requires that there be a primary victim who is the defendant's principal target, and the inquiry is whether the defendant intended to kill everyone in the "zone" to achieve that primary object. (See *Canizales*, *supra*, 7 Cal.5th at p. 603; *Winfield*, at p. 516.) In the typical kill zone case, there would be some basis for determining who was the primary victim.

For example, in *Winfield*, the primary victim had numerous altercations with one of the defendant's as well as that defendant's sister. (*Winfield*, *supra*, 59 Cal.App.5th at p. 504-505.) After one altercation, the defendants waited for the victim to walk into a courtyard and then opened fire with semi-automatic weapons. (*Id.* at p. 505.) The primary victim was hit and fell on top of another individual, who was shot in the leg while standing near the primary victim. One of the defendants then walked over to the primary victim, placed his gun to the primary victim's head, and pulled the trigger. (*Ibid.*) The primary victim was shot ten times while the other

individual was shot only once. (*Id.* at p. 506.) And one of the defendants told the individual who was shot once that he had not intended to shoot him. (*Ibid.*)

Although *Winfield* presents rather severe facts establishing the identity of the primary victim, in the instant action, there is no explanation why James should be considered Morris's primary victim. Before he was shot, James had no interaction with Morris except for walking by him as Morris was leaving the scene after taking Ashley's purse. Indeed, if there was any reason to select a primary victim, it seems most likely that Sean would have been the candidate because he was the one who spoke to Morris, and Morris verbally interacted with him. Thus, it appears that James was assumed to be the primary target because he was the victim who was killed. Yet, this fact alone offers no reason why Morris intended to kill James and not Sean by firing multiple shots into the "kill zone."

Moreover, the prosecution's theory at trial appeared to be that Morris shot at James and Sean as he was fleeing from the robbery to ensure that no one could identify him. In other words, this case was presented to the jury more as a direct intent attempt to kill Sean than a kill zone case. Considering the prosecution's theory of the case and the absence of any explanation why James was the primary victim, we determine the evidence here did not warrant a jury instruction regarding the kill zone.

In addition to our conclusion that the kill zone instruction was not warranted under the facts of the instant matter, the People conceded at oral argument that the kill zone instruction that was provided to the jury was

31

legally erroneous under *Canizales, supra*, 7 Cal.5th 591.[4]  For purposes of our analysis here, we will accept the People's concession.

   C.  The Effect of the Erroneous Jury Instruction and Substantial Evidence

Before we consider the effect of the erroneous kill zone instruction, we analyze Morris's claim that substantial evidence does not support his conviction for attempted murder.  Because we conclude the evidence does not support the giving of a kill zone jury instruction, we focus on Morris's argument that substantial evidence does not support his conviction for attempted murder under a direct intent theory.

We review a sufficiency of the evidence claim under the familiar and deferential substantial evidence standard of review.  (See *People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)  Substantial evidence is evidence that is "reasonable, credible, and of solid value."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  In reviewing for substantial evidence, we presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  (See *People v. Lee* (2011) 51 Cal.4th 620, 632.)  "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

"When a jury's verdict is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is any

---

4    In the respondents' brief, the People argued that the kill zone instruction provided to the jury was proper.  However, they changed their position at oral argument.

substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970, italics omitted.) Whether the evidence presented at trial is direct or circumstantial, the relevant inquiry on appeal remains whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 92; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. (See *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1356.)

To convict a defendant of attempted murder under the direct intent theory, the prosecution must prove "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) Here, a reasonable jury could reach the conclusion that Morris specifically intended to kill Sean as well as James. Sean initiated contact with Morris when the two made eye contact, and Sean said hello as the men were walking by each other. Morris responded aggressively to Sean, telling him "don't fucking talk to us," before taking out the gun and shooting. Unbeknownst to Sean, Morris was trying to leave the scene after taking Ashley's purse. Thus, the jury could reasonably infer that Morris wanted to eliminate anyone who could later identify him, including Sean.

In addition, Morris's use of a .38 or .357 revolver, which he pointed at James and Sean at close range and fired it about four or five times evidenced

his intent to kill. Sean, who was closer to the storefronts, described feeling "air" as Morris was shooting and felt like a few shots went past his chest area. Sean, who was visibly shaken up after the shooting, as seen in the video footage, told an officer that he was hit, but he "moved out of the way." Moreover, the fact that only one bullet made contact with Sean's leg does not suggest Morris was not trying to kill him. For these reasons, substantial evidence supports the jury's finding that Morris intended to kill Sean when he fired his gun at him.

Based on the foregoing analysis, there was sufficient evidence to support Morris's attempted murder conviction without a kill zone instruction. Indeed, this may be the theory under which the jury convicted Morris. However, when both a correct and an incorrect instruction have been given, to determine whether the instructional error requires reversal, we apply *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*).

In *Aledamat*, the defendant was convicted of assault with a deadly weapon after he used a box cutter by thrusting the blade at another man. (*Aledamat*, *supra*, 8 Cal.5th at p. 4.) The trial court instructed the jury with CALCRIM No. 875, which defined a deadly weapon as one that is inherently deadly or used in such a way that it is capable of causing and likely to cause death or great bodily injury. (*Aledamat*, at p. 4.) Our Supreme Court held that "[b]ecause a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons." (*Id*. at p. 6.) Thus, the high court noted that the jurors were given both correct and incorrect alternative instructions; they were told that a weapon "could be *either* inherently deadly *or* deadly in the way defendant used it." (*Ibid.*) The question before the court therefore was whether the error was prejudicial in circumstances where there was nothing in the record to show which theory

34

the jury employed in finding the defendant guilty, but there was plenty of evidence to convict him of use of the box cutter in a deadly manner. (*Id.* at pp. 13-15.)

The court first analyzed whether the erroneous instruction was "factually inadequate" or "legally inadequate." (*Aledamat, supra*, 8 Cal.5th at p. 7.) A " ' "*factually* inadequate theory" ' " is one that is "incorrect only because the evidence does not support it." (*Ibid.*, citing *People v. Guiton* (1993) 4 Cal.4th 1116, 1128.) A " ' "*legally* inadequate theory" ' " is one "incorrect because it is contrary to law." (*Aledamat*, at p. 7.) The court determined the inadequacy was legal because prior case law had established that a box cutter, designed for a utilitarian purpose, is not, as a matter of law, an inherently deadly weapon. (*Id.* at p. 6.)

In assessing prejudice, our high court considered the likelihood that the jurors would have applied the erroneous instruction, not simply the strength of the evidence to support a guilty verdict using the correct instruction. (*Aledamat, supra*, 8 Cal.5th at pp. 13-15.) This focus on the impact of the erroneous instruction rather than the strength of the evidence of guilt was central to the court's reasoning on prejudice in *Aledamat*. In other words, this is not the type of error that can be rendered harmless by "overwhelming" evidence of guilt alone. Instead, under *Aledamat*, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, we determine the error was harmless beyond a reasonable doubt." (*Id.* at p. 3; see *id.* at p. 13.) Therefore, "the question is not whether we think it clear beyond a reasonable doubt that the defendant[ ] [was] actually guilty of . . . attempted murder[ ] based on the valid theory, but whether we can say, beyond a reasonable doubt, the jury's actual verdicts were not tainted by the inaccurate jury

35

instruction. We focus on the likelihood that the jury relied on the kill zone instruction in reaching its verdict[ ], not simply the likelihood of [Morris's] guilt under a legally correct theory." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 399 (*Thompkins*).)

Here, the People contend any kill zone instructional error was harmless beyond a reasonable doubt. To this end, they point out that "there was substantial evidence that [Morris] specifically intended to kill everyone in his path as he was fleeing with Ashley N.'s purse, and that included Sean R." Yet, in making this argument, the People do not explain why it is clear, on the record before us, that no juror found Morris guilty under the kill zone theory. (See *Thompkins*, *supra*, 50 Cal.App.5th at p. 399; *Aledamat*, *supra*, 8 Cal.5th at pp. 13-15.) Moreover, the People all but ignore the emphasis the prosecutor placed on the kill zone in arguing to the jury that Morris was guilty of attempted murder. The prosecutor explained:

> "Attempt[ed] murder, Count 2. This the crime against Sean . . . . [Morris] took one step and it was ineffective. Killed a human being, he intended to the kill, we went through that, I'm not going to go through that again, the intent to kill. How do we know that? By the defendant's actions in this case. I do want to talk about the kill zone.

> "The evidence shows you in this case, and the testimony, that it would be unreasonable to think, 'Oh, I just want to kill James . . . and not Sean . . . .' No. He intended to kill everyone in that kill zone. Those two people, when he fired that gun at least four times, that intended to kill everyone in that kill zone."

The People maintain that the prosecutor "accurately described the kill zone theory" and argued that Morris had the intent to kill, but their contention misses the mark. By referring to the kill zone theory and explaining to the jurors that they could convict Morris of attempted murder

under that theory, the prosecutor was inviting the jury to find Morris guilty using a legally erroneous jury instruction. And, on the record before us, we cannot determine, beyond a reasonable doubt, that at least one juror did not convict Morris under the kill zone theory. As such, we must reverse Morris's attempted murder conviction. (See *Thompkins*, *supra*, 50 Cal.App.5th at pp. 400-401.)

## VI

## THE ADMISSION OF THE BODY CAMERA FOOTAGE

### A. Morris's Contentions

Morris contends the trial court abused its discretion by admitting portions of the footage of two body cameras worn by officers responding to the scene after Sean and James were shot. We disagree.

### B. Background

The prosecution moved in limine to admit footage from the responding officers' body-worn cameras because it captured Sean describing to the officers what occurred before, during, and after the shooting. Defense counsel moved to exclude this evidence because it showed the victim dying and was not relevant to prove any elements of the charged offenses. Counsel also argued the video footage was "gruesome, inflammatory, and [did] nothing to prove or disprove who shot" the victim.

At the hearing on the motion, the prosecutor explained that she sought to admit footage from body-worn cameras of two officers, who responded to the scene of the shooting. The prosecutor wanted to show the first three minutes and thirty seconds of the footage from the first officer, which depicted a brief interview of Sean after the shooting. The prosecutor offered the footage as "a spontaneous contemporaneous statement" from Sean because defense "put forth identification of the shooter as [an] issue in the

37

case." The prosecutor then played the proffered portion of the video for the court. The prosecutor stated that Sean's identification of the shooter was "crucial," and the video would constitute a prior consistent statement from Sean, who would be cross-examined at trial as to what he saw the night in question. In addition, the prosecutor argued the video should be admitted because "it's spontaneous and contemporaneous of what [Sean] saw, what happened, and who the perpetrator was, the suspect, the shooter, just moments after the crime occurred."

Defense counsel objected to the video because it showed James gasping for breath and dying. Counsel argued there were other ways the prosecutor could introduce Sean's statements to the officers, such as asking Sean and/or the police officers what he said. In addition, the defense noted there was a transcript of what Sean said, and the audio of the video could be played so the jury did not have to watch the video. Counsel also insisted that "there are some things that are so emotional and so powerful" that Evidence Code section 352 requires exclusion.

The trial court observed that, although the video showed James dying, it was relevant to the murder charge and showed Sean's statements very close in time to the shooting. Thus, the court determined that the video had "substantial probative value" and its probative value "balance[d] out the prejudicial effect." Pending the proper foundation, the court indicated that it would allow the admission of the portion of the video from the first officer.

Nonetheless, Morris's trial counsel argued that the court only admit the audio from the video. In response, the prosecutor said that the video showed Sean's demeanor, which was important for the jury to see to weigh his credibility. The prosecutor also reiterated that she only wanted to show the

first three and a half minutes of the 11 minute and 40 second video, and that she had edited out the life-saving measures that the video had captured.

The prosecutor also wanted to admit part of the video footage from the second officer's body-worn camera. The entirety of this video was 26 minutes, but the prosecutor wanted to show the jury about five or six minutes, and then fast-forward to another five or six minute segment. The prosecutor played the first proffered portion for the trial court. The trial court said it would admit this excerpt from the video because it was "definitely probative," and "the prejudicial effect [was] substantially outweighed by the probative value." Moreover, the court concluded the video was relevant to the murder charge as well as Sean's credibility. Thus, if the prosecutor could establish the proper foundation, the court was inclined to admit the video.

After the trial court watched the second proffered excerpt from the second officer's body-worn camera, the trial court commented that all three clips were relevant to the murder and attempted murder charges. The trial court pointed out that defense counsel would be questioning Sean's identification of the shooter, so his credibility was an issue at trial. Consequently, the court found it was appropriate to admit all three video clips. The court again found that the video clips were probative, and that the prejudicial effect was substantially outweighed by the probative value. Further, the court noted that case law had found that in murder or attempted murder cases, some photographs or videos may be gruesome, and show blood and gore but were still admissible.

However, the trial court did have an issue with the end of the one of the videos (Exhibit 15), where Sean was telling James to "hang on." The prosecutor agreed to remove that portion of the clip to be shown to the jury.

## C. Analysis

Generally, "all relevant evidence is admissible." (Evid. Code, § 351.) Relevant evidence is that which has any tendency in reason to prove or disprove any disputed fact material to the outcome of the case. (Evid. Code, § 210.) A trial court has broad discretion in determining the relevance of evidence, but lacks discretion to admit irrelevant evidence. (*People v. Hamilton* (2009) 45 Cal.4th 863, 940.) Nonetheless, even relevant evidence may be excluded if the trial court finds that its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Here, Morris likens the video footage to victim photographs. He argues the videos should not have been shown to the jury because they were unduly gruesome and/or inflammatory (i.e., their prejudicial impact substantially outweighed any probative value). Admission into evidence of victim photographs is within the broad discretion of the trial court when a claim is made that the photographs are unduly gruesome or inflammatory. (*People v. Crittenden* (1994) 9 Cal.4th 83, 133.) We will not disturb the trial court's exercise of its discretion unless the probative value of the videos clearly is outweighed by their unduly prejudicial effect. (*Id.* at p. 134; see *People v. Jones, supra*, 57 Cal.4th at p. 924 [an appellate court will not disturb the trial court's ruling unless it determines the ruling is arbitrary, capricious, or patently absurd].) Appellate courts "have rejected the contention that photographs of a murder victim must be excluded as cumulative simply because testimony also has been introduced to prove the facts that the photographs are intended to establish." (*Crittenden*, at pp. 134-135.)

40

Prosecutors "are not obliged to prove their case with evidence solely from live witnesses," and a jury is "entitled" to see photographs of a victim's body "to determine if the evidence supports the prosecution's theory of the case." (*People v. Gurule* (2002) 28 Cal.4th 557, 624.)

In the instant matter, we do not find that the trial court abused its discretion in admitting the three excerpts of the body camera footage. The footage was relevant and probative because it showed Sean's demeanor after the shooting occurred and corroborated his statements regarding the circumstances of the shooting and his identification of the shooter, a critical issue in the case. Indeed, at trial, defense counsel focused on Sean's description of the shooter and the fact he thought the shooter had his hair in cornrows. Counsel used Sean's statements to argue that his identification of Morris was inaccurate because Sean was intoxicated at the time and Morris did not have cornrows at the time of the shooting.

So, playing the video footage for the jury corroborated Sean's description of the shooter and his cohort. It also showed the jury how distraught Sean was when he was talking with the officers. And despite the trauma that Sean had just experienced, he consistently stated that the shooter was wearing a red shirt and a red baseball cap with gray bill on backwards. Accordingly, the video was probative of Sean's credibility.

Against the probative value of the short video clips, the footage admitted in this case was not unduly prejudicial. Although one of the excerpts (Exhibit 15) was more graphic than the other two (Exhibit 16) in that James can be seen lying on the ground, severely injured, the video footage is less gruesome than could be expected considering James was shot three times. While the video showed blood pooling around James's head, he was still breathing and someone was administering CPR to him. And even

41

though blood could be seen on James's face, the video showing James was not especially gruesome (for example, there are no gaping bullet wounds visible). Instead, the video clip depicts the officer's interview of Sean with both Sean and James shown in the clip. James can definitely be seen, but the jury could see Sean's demeanor and hear what he was conveying to the first officer after the officers arrived on the scene.

Moreover, the second two video clips did not show James much, if at all. The first clip showed the officer walking up to the scene where first responders were rendering aid to James, but James was barely visible. When the officer began talking to Sean, he guided Sean away from where James was laying, and eventually had Sean sit on a nearby bench. These second two video clips, which comprised Exhibit 16, were clearly probative of Sean's credibility and were not prejudicial to Morris whatsoever.

Further, Morris's reliance on *People v. Marsh* (1985) 175 Cal.App.3d 987 (*Marsh*) does not alter our analysis. *Marsh* was decided over 35 years ago, and, as the People point out, several more recent cases have found no abuse of discretion when a trial court admitted photographs of the victim. For example, in *People v. Booker* (2011) 51 Cal.4th 141, the "[d]efendant cite[d] a variety of cases, some more than 50 years old, for the proposition that a trial court can abuse its discretion by admitting particularly gruesome photographs." (*Id*. at p. 170.) The Supreme Court responded: "[C]ases of more recent vintage have recognized that photographs of murder victims are relevant to help prove how the charged crime occurred, and that in presenting the case a prosecutor is not limited to details provided by the testimony of live witnesses. [Citations.]" (*Ibid*; see *People v. Scheid* (1997) 16 Cal.4th 1, 16-17; *People v. Carey* (2007) 41 Cal.4th 109, 128; *People v. Heard* (2003) 31 Cal.4th 946, 975.)

42

In addition, *Marsh*, *supra*, 175 Cal.App.3d 987 is clearly distinguishable from the instant matter. There, the prosecution projected onto a screen seven enlarged, gory autopsy photographs "in vivid color" of a two-year-old child who had been brutally beaten to death. (*Id*. at p. 996.) And the prosecutor sought to introduce photos that even he admitted were " 'terribly gruesome and terribly upsetting.' " (*Id*. at p. 997.) For instance, one photo displayed the child victim's exposed brain, including his dangling bloody scalp. In the background of the photo was the child's blood-splattered torso "with the ribcages rolled back to expose the bowels." (*Id*. at p. 996.) Further, these photographs were gruesome not due to the injuries inflicted but because they depicted what the autopsy surgeon had done to the child's body. (*Id*. at p. 999.)

The video footage shown the jury here does not even approach the gruesome nature of photographs shown in *Marsh*. Only one of the three video excerpts showed James for any significant amount of time, and even in that video, the focus was on Sean. Also, although the court in *Marsh* found the viewing of the photographs was of no particular value to the jury and the purpose of exhibiting of them was to inflame the jury's emotions against the defendant (*Marsh*, *supra*, 175 Cal.App.3d at pp. 997-998), here, the video clips were probative of Sean's credibility. Moreover, defense counsel was challenging Sean's testimony identifying the shooter; thus, the video footage focusing on Sean was highly relevant.

Additionally, we reject Morris's contention that the videotapes were merely cumulative of the other evidence admitted at trial. Among other things, the trial testimony and written evidence did not demonstrate Sean's demeanor when he gave the earlier statements to the police at the scene of the crime shortly after the shooting, which was relevant to the jury's

43

credibility determination. (See *People v. Box* (2000) 23 Cal.4th 1153, 1199.) Even testimony regarding Sean's demeanor would not have been a substitute for the videotapes because the actual video is much stronger evidence.

Based on the record before us, we cannot say that the prejudicial nature of the videos substantially outweighed the video's probative value. The court did not abuse its discretion in admitting this evidence.[5]

## VII

## CUMULATIVE ERROR

Morris also contends the cumulative effect of the asserted errors rendered the trial so unfair and unlawful that reversal of the judgment is warranted. Because we determine only one prejudicial error exists, there are not multiple errors to cumulate. As such, Morris's argument based on cumulative error necessarily fails. (Cf. *People v. Vieira* (2005) 35 Cal.4th 264, 305.)

## VIII

## THE UNPLED ENHANCEMENT

### A. Morris's Contentions

Morris asserts that 10 years of his sentence imposed based on two prior serious and violent felony convictions under section 667, subdivision (a) must be stricken because the enhancement allegations were not explicitly pled in the charging documents. We agree.

---

[5] To the extent that Morris is asserting that the trial court's ruling admitting the video footage amounted to a violation of his constitutional rights to "due process and a fundamentally fair trial," it is clear that evidence that has been properly admitted under state law does not violate a defendant's constitutional right to a fair trial. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670.)

B.  Background

The amended information alleged two prior conviction allegations.  It alleged an enhancement entitled "FIRST VIOLENT FELONY PRIOR" but the substance of the allegations mirrored a prison prior enhancement:  Morris "was committed to the Department of Health pursuant to Welfare and Institutions Code section 6300, et. seq." for a February 25, 2011, conviction of assault with force likely to produce great bodily injury (§ 245, subd. (a)(1)) and had not remained free from prison custody for a period of ten years "within the meaning of PENAL CODE SECTION 667.5(a) and (i)."  The amended information also alleged a "STRIKE PRIOR(S)" under "Penal Code sections 667(b) through (i), and 1170.12, and 668," for the same February 25, 2011, violation of section 245, subdivision (a)(1).  The prosecution did not allege that it was seeking a five-year enhancement because Morris had committed a serious and violent felony prior under section 667, subdivision (a).

In pretrial proceedings, the court granted Morris's request to bifurcate the trial on the prior convictions from the trial on the substantive crimes.  Before the jury was discharged, Morris waived his right to a jury trial on the prior conviction allegations.  After a bench trial, the strike prior and prison prior conviction allegations as alleged were found true.

At the time of sentencing, the prosecutor stated that it was her intent to allege a section 667, subdivision (a) prior, not a section 667.5, subdivision (a) prior, that she had only proved a section 667, subdivision (a) prior conviction, not a prison prior, and that the allegation of the prison prior was a "typographical error."  The prosecutor moved "by interlineation to fix the typographical error so it's a Penal Code section 667(a) . . . for purposes of sentencing."

Defense counsel objected, arguing that the section 667, subdivision (a) enhancement had not been pled and proven.  He also provided the court with the case *People v. Nguyen* (2017) 18 Cal.App.5th 260 (*Nguyen*) to support Morris's position.  The court granted "the request to correct the error in the pleading" and also changed the minute order for the court bench trial to "reflect that the People did satisfactorily prove up the nickel prior under Penal Code 667(a)."  The court then sentenced Morris to five years each on counts 1 and 2 for serious and violent felony priors under section 667, subdivision (a), adding an additional 10 years to his sentence.

## C.  Analysis

" 'Due process requires that an accused be advised of the specific charges against him so he may adequately prepare his defense and not be taken by surprise by evidence offered at trial.' " (*People v. Mancebo* (2002) 27 Cal.4th 735, 750 (*Mancebo*).  Where a statute requires an enhancement or special circumstance be pleaded and proved, imposition of a sentence based on an unpled enhancement or circumstance violates the pleading provision of the sentencing statute.  (*Id.* at p. 743 [sentencing of defendant to unpled circumstance of gun enhancement violated explicit pleading provisions of one strike law]; *Nguyen, supra,* 18 Cal.App.5th at p. 267 [trial court erred in imposing five-year sentence enhancement under § 667, subd. (a), where information alleged prior strike, but not prior serious felony conviction].)

In *Mancebo*, our high court reversed the imposition of an enhanced sentence based on a multiple victim circumstance that was not alleged in the information.  (*Mancebo, supra*, 27 Cal.4th at p. 743.)  The court's holding turned on its interpretation of section 667.61, former subdivisions (f) and (i), of the one strike law.  (*Mancebo*, at p. 749.)  Specifically, section 667.61, former subdivision (i), required that " '[f]or the penalties provided in this

46

section to apply, the existence of any fact required under subdivision (d) or (e) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact,' " and former subdivision (f) provided that " 'circumstances specified in [former] subdivision (d) or (e) which are required for the punishment . . . [be] pled and proved . . . .' " (*Mancebo*, at p. 749.)

The information in *Mancebo* alleged the special circumstances that supported a sentence of 25 years to life under section 667.61, former subdivision (e), including use of a firearm, kidnapping, and tying or binding, but not the multiple victim enhancement. (*Mancebo*, *supra*, 27 Cal.4th at p. 740.) However, the trial court sentenced the defendant to a prison term of 25 years to life based in part on the multiple victim enhancement, to enable the court to apply the alleged firearm use enhancement to increase the defendant's sentence by an additional 10 years. (*Ibid*.)

The California Supreme Court observed, "[N]o factual allegation in the information or pleading in the statutory language informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for One Strike sentencing . . . . Thus, the pleading was inadequate because it failed to put defendant on notice that the People, for the first time at sentencing, would seek to use the multiple victim circumstance to secure indeterminate One Strike terms . . . ." (*Mancebo*, *supra*, 27 Cal.4th at p. 745.) The court concluded the People made a discretionary charging decision not to allege the multiple victim enhancement in the information, explaining: "There can be little doubt that the prosecution understood the One Strike law's express pleading requirements and knew how to comply with them. We agree with the Court of Appeal's conclusion that the People's failure to include a multiple-victim-circumstance

47

allegation must be deemed a discretionary charging decision. Not only is this conclusion supported by the record, but [the People do] not contend, much less suggest, how the failure to plead the multiple victim circumstance was based on mistake or other excusable neglect. . . . [¶] . . . Because the People elected to plead the enhancement allegations in this manner [relying on the firearm special circumstance], the express provisions of [the sentencing statute] restricted the trial court to this application." (*Id*. at p. 749.)

The Court of Appeal in *Nguyen, supra*, 18 Cal.App.5th at pages 262, 264-266, applied the Supreme Court's reasoning in *Mancebo* to facts similar to those at issue here, concluding imposition of a five-year enhancement under section 667, subdivision (a), was an unauthorized sentence where the information alleged the defendant had a prior conviction of a strike under the three strikes law, citing to sections 667, subdivisions (c) and (e)(1), and 1170.12, subdivision (c)(1), as well as a prison prior under section 667.5, subdivision (b), but not a prior serious felony conviction under section 667, subdivision (a). The defendant admitted he had a prior conviction for first degree burglary, the burglary was a serious felony, and he had been sentenced to prison for the offense. (*Nguyen*, at p. 264.) During the admission colloquy and at sentencing, the prosecutor represented the defendant was admitting a " 'nickel prior' " under section 667, subdivision (a), without objection by defense counsel. (*Nguyen*, at pp. 264-265.)

The appellate court explained that section 1170.1, subdivision (e), similar to the one strike law provision at issue in *Mancebo*, provides, " 'All enhancements shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact.' " (*Nguyen, supra*, 18 Cal.App.5th at p. 265.) The court observed, "[W]hen, as here, the People allege a prior serious felony conviction, and

48

when they cite the three strikes law but do *not* cite the prior serious felony conviction statute, we can only conclude that they have made 'a discretionary charging decision.' " (*Id*. at p. 267.)  On this basis, the court modified the judgment to strike the five-year term under section 667, subdivision (a), and added a one-year term for the prior prison term enhancement, concluding "the trial court erred by imposing the unpled five-year prior serious felony conviction enhancement." (*Nguyen*, at pp. 270, 272.)

Here, the People argue that *Nguyen* and *Mancebo* are distinguishable because Morris "expressly knew prior to trial that the prior conviction for assault with a deadly weapon would be used to enhance his sentence."  To this end, they point out that in the second amended information, the enhancement was titled "FIRST VIOLENT FELONY PRIOR" and not "FIRST PRISON PRIOR."  However, as the People admit, the subject enhancement referenced the wrong Penal Code section.  Further, the enhancement read as if the prosecution was seeking a prison prior enhancement.  Thus, the record is less than clear that Morris understood the prosecution was seeking an enhancement under section 667, subdivision (a).

In addition, we are not persuaded by the fact that the prosecution proved that Morris had committed a prior violent felony.  We see little difference between the prosecution proving the prior and the defendant in *Nguyen* admitting that he committed a serious prior felony and the prosecutor then commenting that he had admitted a " 'nickel prior' " under section 667, subdivision (a). (*Nguyen, supra*, 18 Cal.App.5th at p. 264.)  Instead, like the court in *Nguyen*, we think section 1170.1, subdivision (e) is quite clear in its requirements:  "All enhancements shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact." (§ 1170.1, subd. (e); *Nguyen*, at p. 266.)

49

And in the instant matter, the serious and violent felony prior enhancement was not alleged in the accusatory pleading.

Nonetheless, the People urge us not to be concerned about the requirements of section 1170.1, subdivision (e), but instead, assert we should focus on section 969.  That section provides:

> "In charging the fact of a previous conviction of felony, or of an attempt to commit an offense which, if perpetrated, would have been a felony, or of theft, it is sufficient to state, 'That the defendant, before the commission of the offense charged herein, was in (giving the title of the court in which the conviction was had) convicted of a felony (or attempt, etc., or of theft).'  If more than one previous conviction is charged, the date of the judgment upon each conviction may be stated, and all known previous convictions, whether in this State or elsewhere, must be charged."  (§ 969.)

Section 969 does not help the People in the instant matter.  That statute does not speak to the requirements of pleading an enhancement, which is at issue here.  Instead, section 969 addresses the requirements of charging "the fact of a previous conviction of a felony . . . ."  (§ 969.)  It is not of the moment in our analysis here.

Further, our conclusion does not change when we consider *People v. Fialho* (2014) 229 Cal.App.4th 1389 (*Fialho*), as the People suggest.  The People rely on *Fialho* for the proposition that only the factual allegations underlying an enhancement must be pled.  They claim the charging document adequately alleged the facts necessary to support a section 667, subdivision (a)(1) enhancement in that Morris was convicted of a serious felony (here, assault with a deadly weapon).  As such, nothing else needed to be alleged.  We do not find *Fialho* instructive here.

In *Fialho*, the information charged the defendant with murder and attempted murder, with enhancements for personally and intentionally

discharging a firearm, causing death or great bodily injury, under section 12022.53, subdivision (d). (*Fialho*, *supra*, 229 Cal.App.4th at p. 1393.) The jury found him guilty of the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter. It also found the enhancements true. (*Ibid*.) However, the enhancements could not apply to the lesser offenses. (*Id*. at pp. 1393, 1395.) The trial court therefore imposed personal firearm use enhancements under section 12022.5, subdivision (a) instead. (*Fialho*, at p. 1394.)

On appeal, the defendant argued that he could not be subjected to the enhancements under section 12022.5, subdivision (a) because they had not been alleged or found true. (*Fialho*, *supra*, 229 Cal.App.4th at pp. 1394-1395.) The appellate court disagreed, concluding "section 1170.1, subdivision (e) does not preclude the imposition of ' "lesser included enhancements" ' [citation] when the charged enhancement is either factually unsupported or inapplicable to the offense of conviction." (*Id*. at p. 1397.) It noted that "there is precedent in case law for imposition of uncharged but ' "lesser included enhancements" ' [citation] . . . ." (*Id*. at p. 1395.)

Thus, *Fialho* applies to lesser included enhancements. As the court in *Nguyen* noted, "The fact that the prosecution alleges that the greatest potentially available enhancement does not suggest that it has made a discretionary charging decision to *forgo* a lesser included enhancement, if the greater turns out to be unavailable." (*Nguyen*, *supra*, 18 Cal.App.5th at p. 269.) Yet, in the instant action, we are faced with a markedly different situation. A serious and violent felony enhancement is not a lesser included enhancement of a prison prior. However, the fact that Morris was previously convicted of a violent felony and served prison time for it could form the basis of two separate enhancements—the nickel prior or the prison prior. We deem

51

the fact that the prosecution did not clearly allege a serious felony enhancement to be a discretionary charging decision.  (See *id*. at p. 267.)

Finally, we are not persuaded that the prosecution's amending of the enhancement allegations after the jury was discharged was permitted under *People v. Tindall* (2000) 24 Cal.4th 767 (*Tindall*) as argued by the People.  In that case, after the defendant waived jury trial on the prior conviction allegations contained in the information and the jury was discharged, the prosecutor moved to amend the information to add three new prior convictions.  (*Tindall, supra*, 24 Cal.4th at p. 770.)  Our Supreme Court held that section 1025 prohibited doing so because, "[u]nder Penal Code section 1025, subdivision (b), a defendant has the statutory right to have the same jury decide both the issue of guilt and the truth of any prior conviction allegations."  (*Tindall*, at p. 770.)  "Because a jury cannot determine the truth of the prior conviction allegations once it has been discharged [citation], it follows that the information may not be amended to add prior conviction allegations after the jury has been discharged."  (*Id*. at p. 782.)  *Tindall* clarified that, in permitting a postdischarge amendment in the absence of an applicable waiver from the defendant, the trial court in that case had "acted in excess of its jurisdiction."  (*Id*. at p. 770.)

In sum, "although the prosecution may amend an information to add alleged prior convictions on the trial court's order until sentencing [citations], the court may not permit such an amendment if the jury has been discharged, unless the defendant waives or forfeits the right to have the same jury try both guilt and the priors [at issue]."  (*Tindall, supra*, 24 Cal.4th at p. 776.)

Here, the People maintain that the amendment to the second amended information was proper under *Tindall* because Morris waived his right to a

jury trial as to the determination of the enhancements.  But he did so before he knew the prosecution was seeking a nickel prior enhancement.  If the prosecution adds a prior conviction allegation after an initial waiver, the defendant retains his statutory rights under section 1025, unless he specifically waives them with respect to the new allegation.  (*People v. Gutierrez* (2001) 93 Cal.App.4th 15, 24.)  Morris did not specifically waive his right to a jury trial with respect to the amended enhancement allegation.  As such, *Tindall* is of no help to the People.

In short, we agree with *Nguyen* and find it instructive in the instant matter.  Where, as here, the prosecution alleged a prior conviction as a strike prior and a prison prior but does not cite the prior serious and violent felony conviction statute or allege it is seeking the five-year enhancement for a serious felony conviction, we must conclude that the prosecution made " 'a discretionary charging decision' " and the trial court cannot impose the nickel priors.  (*Nguyen*, *supra*, 18 Cal.App.5th at p. 267.)  The sentence therefore was unauthorized and must be stricken.

IX

THE IMPOSITION OF MINIMUM FINES

Morris asserts that the restitution and parole revocation fines should be reduced to $300 in accordance with the trial court's stated intention to impose the statutory minimum fines.  Also, he contends that the abstract of judgment should be amended to reflect the trial court's stay of the fines and fees because of his inability to pay.  The People agree that the record indicates that the trial court intended that Morris pay the minimum amounts available and to stay the nonrestitution fines and fees.

Section 1202.4, subdivision (b) provides:  "In every case where a person is convicted of a crime, the court shall impose a separate and additional

53

restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." At the time of Morris's original sentencing, the minimum fine the court could impose was $300. Additionally, section 1202.45 provides that, when the defendant's sentence includes a period of parole, the court shall also impose "an additional postrelease community supervision revocation restitution fine" in the same amount as the restitution fine.

At the sentencing hearing, the trial court initially ordered Morris to pay a restitution fine under section 1202.4, subdivision (b) in the amount of $10,000. After Morris's counsel objected stating that Morris did not have the ability to pay, the trial court said it believed the minimum it could impose was $1,000. The trial court subsequently ordered Morris to pay $1,000 under section 1202.4, subdivision (b), and under section 1202.45, the amount of $10,000, to be stayed unless Morris's supervision was revoked.

With respect to the other fees and fines, the trial court imposed a court security fee under Penal Code section 1465.8 in the amount of $200, a criminal conviction assessment fee under Government Code section 70373, and a criminal justice administration fee under Government Code section 29550.1 in the amount of $154. The trial court then stated its intent was to stay these fines and fees.

We agree with the parties that the record reflects that the trial court intended to impose the minimum possible restitution fines and apparently was unaware that the minimum restitution fine was $300. It also appears that the trial court was not aware that the parole revocation fine under section 1202.45 had to be in the same amount as the restitution under section 1202.4, subdivision (b). Although we have the inherent authority to correct Morris's sentence by imposing the minimum restitution fines of $300

54

under sections 1202.4 and 1202.45 (§ 1260 [appellate court's power to modify judgments]; *People v. Scott* (1994) 9 Cal.4th 331, 354; *In re Ricky H.* (1981) 30 Cal.3d 176, 191), we will instruct the trial court to correct the amount of the fines because we are remanding this matter for resentencing.

Additionally, on remand, the trial court should amend the abstract of judgment and minute order to show that the nonrestitution fines and fees were stayed. "Rendition of judgment is an oral pronouncement." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1183.) "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385; see *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

The trial court granted Morris's request to stay the nonrestitution fines and fees. However, the abstract of judgment and minute order do not reflect the trial court's ruling. Thus, a discrepancy exists between the oral pronouncement of judgment and the minute order for the sentencing hearing and the abstract of judgment. Because the oral pronouncement controls, we order the trial court to amend the minute order and abstract of judgment.

## DISPOSITION

Morris's conviction under count 2 for attempted murder is reversed. On remand, the prosecution may elect to retry Morris for attempted murder under a direct intent theory. Also, Morris's sentence is vacated, and we remand this matter back to the superior court. The court is to resentence Morris consistent with this opinion as well as any retrial that may occur. In addition, the superior court is to prepare an amended abstract of judgment and forward same to the California Department of Corrections and Rehabilitation. In all other respects, the judgement is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

DATO, J.